*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GRACE, Minors.

UNPUBLISHED
March 06, 2026
1:38 PM

No. 369630
Wayne Circuit Court
Family Division
LC No. 2020-000920-NA

Before: BORRELLO, P.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

In these child protective proceedings, the trial court terminated respondent-mother's parental rights to her minor children because respondent, who was homeless, lacked appropriate parenting skills to provide food or care for her children, told police that she no longer wanted her eldest child, failed to engage in the reasonable services provided by the Department of Health and Human Services (DHHS), and because it was in the best interest of the children. Respondent now appeals, raising issues concerning the trial court's reasonable efforts, statutory basis for termination, and best-interest determinations. We affirm.

## I. DHHS'S UNTIMELY BRIEF

Before turning to the merits of respondent's appeal, we open by expressing our disappointment with the timing of DHHS's brief filed in this matter. The State charged in this case that respondent was not capable of rearing her children and successfully convinced the lower court that it met its statutory burden to terminate her parental rights. We expect that in all matters—and especially in ones so serious as permanently removing the right to raise a biological child—that the State will timely devote resources to defending a lower court judgment it desires to enforce. The State's efforts here leave a lot to be desired.

Respondent appealed from the trial court's order and filed her appellate brief on March 10, 2025. The children's Lawyer-Guardian Ad Litem promptly filed an appellee brief on June 9, 2025. On December 4, 2025, this Court notified the parties that the matter would be submitted to our January 13, 2026 case call.

-1-

For reasons unknown to us,[1] DHHS's attorney filed DHHS's appellee brief the day before our argument at 4:34 pm.[2] That is 308 days after respondent filed her appellate brief. We recognize DHHS was not obligated to file an appellee brief, *cf People v Smith*, 439 Mich 954, 954 (1992), but not doing so risks a decision issued on the merits without the benefit of adversarial briefing, see *People v Hatfield*, 46 Mich App 149, 151; 207 NW2d 485 (1973). There are of course many understandable reasons for delayed filings. The consequences of doing so, however, affect oral argument preparation and, in this case, the ability to file a reply brief before oral argument. We thus emphasize our desire that parties timely file briefs to best aid in our consideration of every case before us.

## II. BACKGROUND

DHHS initiated proceedings after police found respondent and her mother riding scooters with respondent's eldest child, JMG, in the bottom of respondent's scooter, unsecured and covered with a blanket. At the time, respondent was a minor and homeless, living in a church annex with no shower or bathing facilities and only feeding JMG peanut butter and bread. During this initial interaction with police, respondent advised that she no longer wanted JMG. Respondent, who had only completed the ninth grade, was later diagnosed with cognitive impairments and mental health challenges. JMG, for his part, was diagnosed with autism spectrum disorder.

Following the initial dispositional hearing regarding JMG, the trial court ordered respondent to achieve compliance with her parent-agency treatment plan (PATP), which included a psychological evaluation, individual counseling, a parent partner, cooperating with court-appointed special advocates, obtaining a legal source of income and suitable housing, and participating with Infant Mental Health services. DHHS was also directed to provide or facilitate for respondent housing and educational assistance.

Respondent struggled to comply with her PATP from the beginning. For example, while she attended her initial psychological evaluation, she did not tell the clinician that she was a mother to JMG at that time. And in June 2021, she gave birth to JTG, who was immediately brought into care because of respondent's untreated mental health issues. Respondent also did not attend visitations with her children on a regular basis. When she did visit, she had difficulty and needed assistance with feeding and changing the children. During this time, respondent was living with a

---

[1] The Court Rules provide parties with *some* flexibility with filing deadlines. Here, MCR 7.212(A)(2)(a)(i) required DHHS to file its brief within 21 days of service of appellants' brief, but permits this Court to extend that deadline "on motion." That is for good reason—deadlines ensure timely processing of cases, while the ability to extend deadlines recognizes that good cause often exists to accommodate other scheduling considerations. DHHS did not comply with this Court Rule. Because the Clerk's Office nonetheless accepted the brief for filing, we will consider the brief as appropriately filed.

[2] We also note that DHHS filed tardy briefs in two other cases before this panel's January 2026 case call. In *In re Carter/Martin/Waller/Hunt* Minors, No. 373677, DHHS filed an appellee brief on the day of argument at 4:16 pm (i.e., after the case was submitted), and filed an appellee brief the day before argument in *In re Owens Minors*, No. 375167.

boyfriend, who had a criminal record that included a history of domestic violence. The couple also allowed roommates in and out of the house, rendering the housing unsuitable for JMG and JTG.

Although respondent attended therapy appointments, she did so ostensibly because respondent's therapist reached out to contact her directly for their sessions, and she did not avail herself of bus passes to attend other service appointments. By the time of the statutory-grounds stage of the termination hearing, respondent had not yet achieved suitable housing and a legal source of income. While she had expressed interest in jobs at McDonald's and Family Dollar, she had not applied for the positions. Nor did she regularly visit JMG and JTG.

Evidence introduced subsequently at the best-interest portion of the termination hearing confirmed that DHHS staff, as well as the clinician who conducted a Clinic for Children's Study report, determined that it was in the best interests of each child for respondent's parental rights to be terminated, particularly given the length of time each child was in care and because they were thriving in their respective foster placements. Following the best-interest stage of the hearing, the trial court ordered respondent's rights terminated under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).[3]

## III. REASONABLE EFFORTS

As was the case throughout the proceedings below, respondent first argues the trial court wrongly concluded DHHS made reasonable efforts toward reunification as to both children because respondent was not provided services. On clear error review of the trial court's factual findings regarding reasonable efforts toward reunification, *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022), we disagree.

The Probate Code mandates that DHHS make reasonable efforts to reunify the child and family in all cases except those involving aggravated circumstances delineated in MCL 712A.19a(2). *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017); *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022). When faced with a parent who also has a qualified disability, as is the case here, "efforts at reunification cannot be reasonable . . . unless [DHHS] modifies its services as reasonably necessary to accommodate a parent's disability." *In re Hicks/Brown*, 500 Mich at 90. As explained by our Supreme Court:

> Under Michigan's Probate Code, the Department has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. MCL 712A.18f(3)(d) (stating that the service plan

---

[3] The court ultimately terminated the parental rights of JMG's father, who is not a party to this appeal, as well as the parental rights of JTG's unknown father, whose identity could not be determined.

shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home").

> The Department also has obligations under the [Americans with Disabilities Act (ADA), 42 USC 1201 *et seq*.,] that dovetail with its obligations under the Probate Code. Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132. Public entities, such as the Department, must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service" provided. 28 CFR 35.130(b)(7) (2016).
>
> Absent reasonable modifications to the services or programs offered to a disabled parent, the Department has failed in its duty under the ADA to reasonably accommodate a disability. In turn, the Department has failed in its duty under the Probate Code to offer services designed to facilitate the child's return to his or her home, see MCL 712A.18f(3)(d), and has, therefore, failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2). As a result, we conclude that efforts at reunification cannot be reasonable under the Probate Code if the Department has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA. [*In re Hicks/Brown*, 500 Mich at 85-86.]

Commensurate with DHHS's obligation, a disabled parent has an obligation to participate in the services that are offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Here, respondent fails to demonstrate that the trial court clearly erred in concluding that DHHS satisfied its burden to make reasonable efforts at reunification, with or without necessary accommodations. DHHS foster-care worker Chelsea DeCarlo explained that from the beginning of the proceedings, DHHS was aware of respondent's cognitive limitations and made appropriate accommodations for respondent's capabilities. DeCarlo also confirmed that in each referral, she specified that respondent was a minor at the time and "has some limitations regarding what she can and cannot do due to her age," and that she also had cognitive limitations. Contrary to respondent's position on appeal, the record reflects that respondent was not cooperative in participating in most of the services offered by DHHS. To be sure, respondent's mother may have been a hinderance to respondent's success, but when made aware of her behavior, DHHS took steps to mitigate her involvement.

Faced with the overarching issue that respondent's cognitive delays hindered her ability to comply with her court-ordered services, DHHS continued to make necessary modifications. The record indicates that as concerns arose regarding whether services were appropriate to accommodate respondent's needs, DHHS made referrals or modifications as necessary, like when it referred her for additional parenting classes, as well as a program that would be better suited to respondent's cognitive impairment, in response to concerns regarding whether respondent's parenting classes were adequately tailored to address parenting a child with special needs like

JMG. Moreover, during a dispositional review hearing, Stephanie Sears, the director of the child-welfare program assisting respondent, specifically explained the steps DHHS took to ensure that it accommodated respondent's cognitive impairments in the course of providing services and what the agency planned to do going forward to ensure that respondent was properly supported. Supportive visitation was put in place to provide respondent with an "additional layer of support" during her visitation time with the children. Respondent was also provided with a parent partner "to help offer an additional layer of support to [respondent]" to ensure "service delivery" to respondent. Sears also planned to speak to her foster-care supervisor to determine what other steps could be taken to help respondent fully comply with her PATP.

DHHS also referred respondent to the Neighborhood Services Organization (NSO)—an organization that assists parents with developmental delays that have young children—specifically to address the compliance issues arising from respondent's cognitive delays. When respondent was not accepted to receive services from NSO, her foster-care worker, Lauree Pryor, agreed to look into other organizations that could help respondent with her cognitive limitations. DHHS took efforts to personally transport respondent to her appointments for services and provided respondent with bus passes, yet respondent did not participate (allegedly because she was uncertain of the time of the appointments).

While for a brief period respondent was more compliant with her plan and her parenting was improving, respondent's progress did not endure. She did not take initiative to comply with services and was not visiting JMG and JTG because she felt "tired." DHHS also coordinated services for respondent between Detroit Wayne Integrated Health, NSO and Lincoln Behavioral, but respondent did not contact the agencies or otherwise follow through, explaining that she had simply forgot, and thus did not complete the initial intake.

In summation, the trial court did not clearly err in concluding that DHHS had used reasonable efforts to reunify respondent with her children, and her contention that DHHS did not take adequate steps to accommodate her disability before petitioning to terminate her parental rights is thus without merit.

## IV. STATUTORY GROUNDS

Respondent next argues that the trial court erred in determining that DHHS presented clear and convincing evidence to warrant termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g) and (j). Applying a clear-error standard of review, *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021), we conclude that the trial court did not err in finding, by clear and convincing evidence, that at least one statutory ground existed to terminate respondent's parental rights, *In re Atchley*, 341 Mich App at 346 n 6.

MCL 712A.19b provides, in pertinent part:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

To refresh, JMG had been removed from respondent's care and jurisdiction had been acquired over him because respondent was homeless, did not have the means or ability to care for JMG, had expressed that she did not want to care for JMG, and had been found with JMG riding unsecured in her scooter, a situation in which he faced potential harm. JTG was removed from respondent's care because JMG had already been removed from her care. At the time of the statutory-grounds stage of the termination hearing in April 2023, and later at the best-interest portion of the hearing in December 2023, the conditions that led to the adjudication of both JMG and JTG continued to exist, and thus the court did not clearly err by concluding that DHHS had presented clear and convincing evidence to support termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*).

Respondent had been diagnosed with adjustment disorder and depressive-mood disorder, was not compliant with her court-ordered treatment plan, and had been terminated from all of her services because of noncompliance. A significant amount of time passed before respondent finally participated in a psychological evaluation as ordered by the court, finally completing the evaluation in November 2022. The record reflects that respondent did not attend her scheduled appointments to have an evaluation conducted for several reasons, including forgetting the time or simply not showing up for the appointment. Respondent's first psychological evaluation was of limited value, given that respondent did not even tell the clinician that she was a mother to JMG. The November 2022 evaluation indicated that respondent's prognosis was guarded, and while the

clinician opined that respondent could benefit from services, she had been provided with services for well over two years when the termination hearing began and had not benefited from the services.

Respondent also had not improved her housing situation, because at the time of the statutory-grounds portion of the termination hearing, she was residing with her boyfriend, an individual with a known criminal record for domestic violence. She also did not have beds for her children in the home, the home had significant damage, and respondent had roommates that randomly came in and out. While no longer residing with her boyfriend at the best-interest stage of the termination hearing, respondent still had not obtained suitable housing. In addition, respondent also was not visiting her children regularly as required, and her regular attendance at therapy was in large part attributed to the actions of her clinician in reaching out to respondent to ensure her attendance. Therefore, the record was replete with evidence that respondent continued to struggle with obtaining full compliance with her PATP as to both children.

Accordingly, under these circumstances and given the length of the proceedings, the court did not clearly err in its conclusion that there was no reasonable likelihood respondent would be able to rectify the conditions giving rise to adjudication within a reasonable time given the age of the children.[4]

## V. BEST-INTEREST DETERMINATION

Finally, respondent claims that the trial court clearly erred by concluding that it was in the best interests of JMG and JTG to terminate respondent's parental rights. We disagree because we are not left with a definite and firm conviction that a mistake was made. See *In re Keillor*, 325 Mich App 80, 85; 923 NW2d 617 (2018).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Whether termination of parental rights is in a child's best interests must be proved by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). At the best-interest stage, the focus is on the child, not the parent. *In re Atchley*, 341 Mich App at 346. When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors, including

the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. Other considerations include the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan. [*In re*

---

[4] Because only one statutory ground is required to be established, *In re Atchley*, 341 Mich App 346 n 6, we need not address the additional statutory grounds on which the trial court relied to terminate respondent's parental rights.

*Payne/Pumphrey/Fortson*, 311 Mich App 49, 63-64; 990 NW2d 685 (2015) (quotation marks and citations omitted).]

The court is also required to consider a child's placement with a relative, which is a factor that weighs against termination. *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015).

The trial court did not clearly err in its determination that termination of respondent's parental rights was in the best interests of both JMG and JTG. The court recognized that respondent had not achieved full compliance with her PATP in the almost three years since it had been established and that, despite her good intentions, it was her lack of initiative that hindered her ability to achieve full compliance. Put another way, the record contained ample evidence of DHHS's consistent efforts to link respondent to the necessary services and accommodations that would allow for reunification, but in the end respondent did not take advantage of these services. In making its determination, the court also considered the importance of the children's need for permanency, stability, and finality, and in particular, that JMG had been in care for most of his life and JTG for all of his life. With regard to JMG, the court also acknowledged that JMG's special needs were being addressed in his foster home, and that the symptoms of his autism-spectrum disorder had minimized since JMG had resided with his foster family. While respondent had repeatedly expressed her love for both of her children, the court emphasized that at the best-interest stage of the termination proceedings its focus was on the best interests of each child. The court also noted that while the siblings were in different placements, they would be able to maintain contact with each other. Accordingly, after weighing the best interests of both JMG and JTG, the court did not clearly err in its determination that termination of respondent's parental rights was necessary.

## VI. CONCLUSION

For these reasons, we affirm the trial court's judgment.

/s/ Stephen L. Borrello
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock